**Bruce BANTHER, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 100, 2008.**

Supreme Court of Delaware.

Submitted: May 21, 2009.

Decided: July 29, 2009.

---

6. *Id.* at 100 (Footnotes omitted.)

7. 925 A.2d 1265 (Del.2007).

8. *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142, 149 (Del.1980).

Kevin M. Howard, Esquire, Dover, Delaware, and Edward C. Gill, Esquire (argued), Georgetown, Delaware, for appellant.

Stephen R. Welch, Jr., Esquire (argued), Stephen E. Smith, Esquire, and John

Williams, Esquire, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

HOLLAND, Justice.

This is the defendant-appellant Bruce Banther's direct appeal of his 2008 convictions and sentence for Murder in the First Degree[1] and Possession of a Deadly Weapon During the Commission of a Felony.[2] In Banther's first jury trial, completed in October 1998, Banther was acquitted of Conspiracy in the First Degree,[3] but convicted of Murder in the First Degree,[4] Forgery in the Second Degree,[5] and Felony Theft.[6] On appeal, this Court reversed Banther's convictions and remanded the matter for a new trial.[7]

Before the second trial commenced, Banther pled guilty to Forgery in the Second Degree[8] and Felony Theft.[9] Banther's second trial necessarily precluded prosecution for Conspiracy in the First Degree[10] as a result of Banther's acquittal of that charge in the first trial. When Banther's second trial concluded, the jury convicted him of Murder in the First Degree[11] (arguably based the State's theory of accomplice liability) and Possession of a Deadly Weapon During the Commission of a Felony.[12] On appeal, this Court reversed Banther's second conviction and remanded the matter for a third trial.[13] We held that because the trial judge allowed the State, over Banther's objection, to prove and argue that Banther agreed with his codefendant John Schmitz to plan and aid in the murder, the trial judge failed to account for the collateral estoppel effect of the earlier conspiracy acquittal. Banther was tried for a third time in January 2008.

Banther has raised several issues in this direct appeal of his third trial. First, he argues that the trial judge's failure to properly focus the jury by giving a preliminary limiting instruction was a violation of this Court's mandate and constitutes reversible error. Second, he contends that there was no evidence in the record to support the State's theory that Banther was Schmitz's accomplice. Third, he submits the trial judge erred by permitting Schmitz to testify, because that testimony was precluded by the doctrine of judicial estoppel. Fourth, Banther claims that the State violated his due process rights "under both the Delaware and United States constitutions" by asserting a new theory of criminal responsibility—i.e., that Banther acted as a principal—at Banther's 2008 retrial. Fifth, Banther claims the trial judge erred by permitting the State to present alternative theories of Banther's criminal liability as either a principal or an accomplice. Sixth, according to Banther, the trial judge erroneously admitted four hearsay statements that violated his federal Constitutional right to confront the witnesses against him. Seventh, he argues that the State made improper closing arguments to the jury.

1. Del.Code Ann. tit. 11, § 636(a)(1).

2. Del.Code Ann. tit. 11, § 1447(a).

3. Del.Code Ann. tit. 11, § 513.

4. Del.Code Ann. tit. 11, § 636.

5. Del.Code Ann. tit. 11, § 861(b)(2).

6. Del.Code Ann. tit. 11, § 841.

7. *Banther v. State,* 823 A.2d 467 (Del.2003).

8. Del.Code Ann. tit. 11, § 861(b)(2).

9. Del.Code Ann. tit. 11, § 841.

10. Del.Code Ann. tit. 11, § 513.

11. Del.Code Ann. tit. 11, § 636(a)(1).

12. Del.Code Ann. tit. 11, § 1447(a).

13. *Banther v. State,* 884 A.2d 487 (Del.2005).

We have carefully considered all of Banther's claims. We have concluded that none of those claims are meritorious. Therefore, the judgments of the Superior Court must be affirmed.

### Facts [14]

In the early morning hours of February 12, 1997, Harrington Police dispatcher Cheryl Knotts (now Cheryl Knotts–Woods) received a number of telephone calls from a person who identified himself as Dennis Ravers. The caller said that he had agreed to meet with Bruce Banther and another person, whom he referred to as "Charles," at the Harrington Moose Lodge, but that he had gotten lost and was looking for a safe, public place to meet them, as the Moose Lodge was closed. Knotts–Woods persuaded the caller, who was calling from a nearby tavern, to meet with her at the Harrington Police Department to discuss his concerns. Knotts–Woods met briefly with the caller outside the Harrington Police Station. After that meeting, the caller again contacted dispatcher Knotts–Woods and informed her that he had agreed to meet with Banther and "Charles" at the Farmington Fire Hall on Route 13.

Between 6:30 a.m. and 7 a.m. on February 12, 1997, as Tom VanVliet was on his way to work, he drove by a garage owned by Frank Kricker on Mesibov Road and noticed two small fires burning on the ground. VanVliet stopped and began to stomp out the fires. While VanVliet was stomping out the fires, Rick Pinckney, an acquaintance of Kricker's, drove by, observed VanVliet stomping out the fires and asked VanVliet if he needed help. Pinckney then drove to Kricker's home and told Kricker what he had seen.

Frank Kricker drove to his garage to investigate. When he returned after daylight, Kricker inspected the ground where the fires had been located and found a pair of eyeglasses and a set of car keys nearby. Kricker picked up the keys and eyeglasses and returned to his home, where he contacted the Delaware State Fire Marshall's Office to report what he had seen.

Deputy Fire Marshall William Sipple responded to the scene, where he observed what appeared to be blood in the areas where the fires had burned and what appeared to be body tissue on the tire and wheel of a nearby truck. Sipple reported what he had observed to the Criminal Investigation Unit at Delaware State Police Troop No. 3. Detective David Weaver, an evidence technician, was dispatched to the scene. Upon his arrival, Weaver also observed what appeared to be blood in the burned areas and body tissue on the truck's wheel and tire. Samples collected from the scene were sent to a laboratory for analysis and it was determined that they contained blood and human brain tissue.

Although the evidence collected from the crime scene led police to conclude that a homicidal assault had occurred outside Frank Kricker's garage on or about February 12, 1997, they had no leads regarding the identity of the victim or the perpetrators. At a monthly Kent County investigators meeting, a Harrington Police Detective told the other detectives about

---

14. The facts represent a compilation of the recitations in the parties' briefs. Apart from the testimony of John Schmitz, who did not testify at Bruce Banther's first two trials in 1998 and 2004, the evidence presented at Banther's third Superior Court trial in January 2008 is substantially similar to this Court's prior factual summaries in *Banther v.* *State*, 884 A.2d 487, 489–90 (Del.2005), and *Banther v. State*, 823 A.2d 467, 472–76 (Del. 2003), as well as in the Superior Court's 1998 decision on Banther's pretrial suppression motion. *See State v. Banther*, 1998 WL 961765, at *1–4 (Del.Super.Ct. Sept.24, 1998).

the strange phone calls dispatcher Knotts–Woods had received on the morning of February 12, 1997. The homicide detectives arranged a meeting with Knotts–Woods. When they showed her the glasses found at the crime scene, Knotts–Woods became visibly upset. She identified the glasses as those worn by the caller she met on February 12, 1997, who had identified himself as Dennis Ravers.

The detectives learned from the Dover Air Force Base Office of Special Investigations that Banther and Ravers had been seen together previously at the base. Thereafter, officers began to follow Banther's acquaintance, John Schmitz, in hopes that he would lead them to Banther. On February 25, 1997, the officers followed Schmitz to the Dover Downs Casino, where he met with Banther. Banther was driving a tan Mazda.

Detectives then followed Banther and Schmitz into Maryland, where Schmitz retrieved his Dodge Dakota pickup truck, which was parked near a small country store. The Delaware detectives continued to follow Banther and Schmitz as they traveled in separate vehicles in the direction of the Chesapeake Bay Bridge. As they approached the Kent Island area, the Delaware detectives requested assistance from the Maryland State Police.

At approximately 6:30 p.m., Deputy Michael Branham of the Queen Anne's County, Maryland, Sheriff's Department heard a radio broadcast that the Delaware State Police needed assistance in the area of Route 650 westbound in Stevensville, Maryland. Branham followed the tan Mazda across the Chesapeake Bay Bridge into Anne Arundel County, Maryland, where he stopped the vehicle for a traffic violation. At the scene of the stop, the driver of the tan Mazda produced no identification and told Branham that his name was Jeffrey Ray Eldridge. Branham searched the interior compartment of the vehicle and found a wallet containing Banther's military identification, which enabled him to identify the driver of the tan Mazda as Banther.

Between February 25, 1997, and July 30, 1997, Banther participated in seven taped interviews with Delaware State Police detectives and one taped interview with a Maryland State Police officer. Redacted tapes of seven of the interviews were played for the juries in all three of Banther's trials. Initially, two weeks after Ravers was killed, Banther told the police that, as far as he knew, Ravers was still alive and had flown to California. Later, during lengthy taped interviews on March 5 and 6, 1997, Banther admitted that Ravers was dead and said that he had been killed by a drug dealer named "Merlin Oswald."

On March 12, 1997, after leading the detectives and North Carolina authorities to Ravers' body near Godwin, North Carolina, Banther told Special Agent Timothy Thayer of the North Carolina State Bureau of Investigation that "he and a gentleman named John Schmitz had met with Mr. Ravers at a location I think in Harrington, Delaware, and an argument ensued, and that Mr. Schmitz had hit Mr. Ravers in the head with an axe." Special Agent Thayer passed this information along to the Delaware detectives, who conducted additional taped interviews with Banther on March 13 and 14, 1997.

During the March 13, 1997, interview, Banther described meeting with Schmitz and Ravers in the early morning of February 12, 1997, near Williamsville, Delaware, and then traveling with both of them to the scene of the murder on Mesibov Road. He said Schmitz and Ravers got into an argument:

> And then Dennis pushed John, and they started fighting. And then, ah, I think

Dennis was gonna go to his car and get his gun or something. John went to his truck and took out an axe. And then they started fighting again. John hit him in the head. And, ah, he started bleeding. And, ah, and he hit him again.

He went on to say that when Schmitz went back to his truck to get the axe, Ravers went to his car to get a pistol, which Banther later threw into the Chesapeake Bay. Banther again stated very clearly that it was Schmitz who had assaulted Ravers and killed him with the axe:

Detective Evans: Okay, Dennis is assaulted by John.

Banther: Yes, sir.

Evans: He's hit a couple of times in the head with the axe?

Banther: No. First he hits him with his fist.

Evans: Okay. And then he hits him a couple times with this axe you've just . . .

Banther: Dennis is maybe a little taller than John.

Evans: Uh-huh.

Banther: John—, Dennis is pretty strong 'cause he works out a lot and stuff. But John's a lot, I mean, John's just fucking huge. Ah, he hits him and then backs, pops him in the head.

Evans: With the axe?

Banther: Yes, sir.

During the March 13, 1997, interview, Banther said that Schmitz and Ravers began to argue because Ravers "had been writing letters to John's work . . . and [John's] captain and his supervisor wanted to know who Dennis was." In subsequent interviews, on March 14, 1997, and July 20, 1997, Banther explained further that Ravers was trying "to put . . . pressure on John" and that Schmitz was angry because Ravers had taken a large quantity of blue jeans purchased with $4,000 that had been loaned to Schmitz by his father.

During the March 14, 1997, interview, Banther again described the physical confrontation at Mesibov Road and said that Ravers had his gun in his pocket when Schmitz killed him, that Ravers had not pointed the pistol at Schmitz, and that Banther did not believe that Ravers had intended to use it to shoot Schmitz. During this interview, Banther also claimed that he had had no motive to kill Ravers. He denied participating in the fight himself, stated that he did nothing to stop what had happened, and admitted that he did not flee after he saw Schmitz kill Ravers with the axe. On March 13, 1997, however, he had described, at considerable length, how he and Schmitz worked together to dispose of Ravers' body immediately after the murder. On March 14, 1997, Banther admitted that he subsequently disposed of the axe by placing it in a locker at the Walter Reed Inn in Washington, D.C., where the police later recovered it.

In this appeal, Banther asserts that his third trial, completed in February 2008, consisted of a circumstantial case with no confession and no forensic evidence tying him to the actual homicidal assault. The parties agree that the State's evidence was virtually identical to the record presented in Banther's first two trials with one exception. The State called Banther's co-defendant John Schmitz to testify. Schmitz testified that Banther killed Ravers.

John Schmitz, an active duty member of the United States Air Force, met Bruce Banther in early 1994 at the Dover Air Force Base barracks. After Schmitz moved off base to live with another airman, Michael Hall, in a house on Beebe Road near Farmington, Delaware, Banther would stay at the house from time to time. During his January 28, 2008, testimony at Banther's retrial in the Kent County Supe-

rior Court, Schmitz identified an axe as one purchased by Banther in Schmitz's name that had been mailed to the Beebe Road address. Schmitz and Banther traveled together to Germany on "space available" military flights, an economical way for active and retired military personnel to travel overseas. When Schmitz moved back to the Dover Air Force Base barracks, Banther made copies of both Schmitz's room key and the key to Schmitz's Dodge Dakota truck.

In April 1996, Schmitz received a $4,000 cashier's check from his father to pay to transport Schmitz's property to his new duty assignment in Germany. When Schmitz's Germany orders were rescinded because he was overweight, Banther borrowed the $4,000 from Schmitz to invest in "a blue jeans smuggling operation." The plan was for Banther to buy new and used jeans from a used clothing store in the Georgetown area of Washington, D.C., for $10 and $15 per pair and to resell the clothing in Europe for more than $100 a pair. Because the Air Force did not check the bags of military personnel flying "space available," Banther and Schmitz had a way to transport the blue jeans to Germany for resale. At one point, Schmitz had more than 400 pairs of blue jeans in his barracks room and at an off-base storage unit. The blue jeans resale enterprise was not successful. Schmitz testified that he thought Banther had sold no more than six pairs of blue jeans. The bulk of the blue jeans ended up in air base storage lockers in Berlin and Frankfurt, Germany.

In addition to the blue jeans resale venture with Schmitz, Banther had a similar business deal with a retired military man named Dennis Ravers. Although Schmitz had no business dealings with Ravers, Schmitz knew that Banther and Ravers were engaged in a similar plan to transport bike and car parts, as well as blue jeans, on "space available" military flights for resale in Europe. Prior to February 12, 1997, Schmitz had met Ravers on two occasions; initially, when Banther brought Ravers to the Beebe Road residence, and later, when Ravers came to Schmitz's barracks looking for Banther.

Schmitz knew that Banther and Ravers also traveled to Europe together, but he recalled that Banther complained about Ravers. Schmitz testified that Banther said, "Ravers was sticking his nose into his business too much and that, you know, sometimes he can't shake him." Schmitz stated that sometimes Banther would try to leave Ravers in Washington, D.C., and return alone to Delaware to do things out of Ravers' presence. Banther told Schmitz that Ravers had pawned Banther's ring, which Ravers was holding as collateral for a loan to Banther.

On February 10, 1997, although he was not supposed to be in the area, Banther walked into the Dover Air Base heavy maintenance vehicle unit and asked to borrow Schmitz's truck keys. Schmitz's workplace was located about 100 yards from the Base Security Police office. About an hour after Schmitz gave Banther his truck keys, Schmitz was contacted by the Base Security Police squadron because they were looking for Banther after he had escaped from their custody.

Around noon the follow day, February 11, 1997, Schmitz received a telephone call from Banther requesting that Schmitz meet him that evening at a McDonald's restaurant outside the Air Base so that Banther could return Schmitz's truck. Although the McDonald's was closed, Schmitz met Banther at the restaurant shortly before midnight on February 11, 1997. Banther advised Schmitz that he needed to meet Ravers at the Harrington Moose Lodge that evening in order to get

money from Ravers to repay the $4,000 loan from Schmitz.

According to Banther, he intended to pay Schmitz $5,000 and to return Schmitz's truck following the nighttime meeting with Ravers. Schmitz borrowed a Volkswagen pickup truck from another airman and followed Banther, who was driving Schmitz's Dodge Dakota pickup truck, to Harrington for the meeting with Ravers. Banther told Schmitz that he and Ravers were going to buy a truck parked at a garage near Farmington for use in their jeans and motor vehicle parts resale business. After several telephone calls, Banther located Ravers at a Harrington bar.

Banther asked Schmitz to wait at a liquor store near the Farmington Firehouse while Banther drove to Harrington to get Ravers. Banther further instructed Schmitz to follow him when he returned and to look for Banther flashing the Dakota's lights when Banther drove by the liquor store. The Farmington liquor store was near Michael Hall's residence on Beebe Road where Schmitz and Banther had lived previously. When Schmitz saw Banther and Ravers drive by in separate vehicles, he followed the two down Beebe Road until they turned onto Mesibov Road and stopped at a garage. Schmitz testified that Ravers was driving a blue Honda or Toyota automobile.

After the three men exited their respective vehicles at the Mesibov Road garage, Ravers told Schmitz that he thought Schmitz was supposed to be an individual named "Charles." When the garage motion sensor light came on, Banther said the truck they were going to purchase was there. Schmitz then asked Ravers if he was really going to buy "this junk." Schmitz testified that Ravers did not have an opportunity to respond to Schmitz's inquiry because: "I saw Bruce walking around the bed of my pickup truck with an axe raised, and he was wearing his rain gear, coming fast at Dennis." Banther was about ten feet away, approaching Ravers with a raised axe, Schmitz testified.

Next, Schmitz told the jury, Banther "struck Dennis in the head with the axe." Schmitz described the first blow to the much taller Ravers as "glancing." Schmitz further described the first axe blow to Ravers' head: "It hit him, just bounced right off. And that stunned Dennis bad." Banther then hit Ravers on the side of the head with the axe a second time and Ravers began to stagger. When Banther hit Ravers a third time, Schmitz testified, Banther "sunk the axe into his head." Following the third axe blow, Ravers fell to his hands and knees. Schmitz stated: "Bruce looked up at me and said, 'He won't die.' And then he swung the axe down with both hands with a grunt and hit him." This fourth axe blow struck the top of Ravers' head and Ravers fell to the ground. As Banther pulled the axe out of Ravers' head, blood and other material on the axe hit Schmitz in the chest and face.

According to Schmitz, Banther then removed a large green trash bag from the back of Schmitz's pickup truck and began putting the bag on Ravers' head. After Banther told him "to get over here and help," Schmitz assisted Banther in placing Ravers in the trash bag. The two men carried Ravers to the bed of the Dakota pickup truck. Schmitz heard Ravers' "hard, labored, rasping breath." Schmitz said, "He was struggling to breathe."

When Banther drove away in the Dakota with Ravers in the back, Schmitz followed him in the Volkswagen. Banther stopped near a steel barrel and a stack of boxes on the side of a big drainage ditch past the Farmington railroad tracks. Schmitz estimated that the fifty-five gallon steel drum, which he referred to as a "burn barrel," was located about a quarter

of a mile down a dirt road, behind some trees.

Schmitz and Banther removed the still-breathing Ravers from the back of the Dakota and dumped Ravers "head first into the barrel." Schmitz again described Ravers' breathing as "hard, rasping breath, labored breathing." Initially, Banther was not able to burn Ravers' body in the barrel and Ravers' legs were sticking out of the burn barrel. Schmitz took a claw hammer from Banther to make air holes in the barrel. Thereafter, the fire in the barrel burned better. As the fire continued to burn, Banther told Schmitz to take the borrowed Volkswagen to the Air Base and pack a bag to go to Washington, D.C. Schmitz returned the truck, packed a bag, and walked to the south gate of the Base, where Banther picked him up in Schmitz's Dakota.

Banther and Schmitz retrieved Ravers' car on Mesibov Road, and Schmitz drove Ravers' car back to the burn barrel. At the 2008 trial, when asked why he was still helping Banther, Schmitz replied: "I didn't think I had a choice." At the burn barrel, Schmitz could see two blackened legs sticking out of the barrel. Banther and Schmitz wrapped Ravers' body in a blanket and placed Ravers in the trunk of his car. Banther drove Ravers' car with the body in the trunk and Schmitz followed in his Dakota to a military hotel across the street from the Walter Reed Hospital in Washington, D.C.

Schmitz and Banther checked into the hotel and took some of Ravers' belongings and the axe up to their room. Schmitz parked Ravers' car at the bottom of the hospital underground parking garage next to an exhaust vent. While Banther cleaned the axe, he told Schmitz, "I got medieval on him," referring to Ravers. In Ravers' belongings, Banther found $200 cash, a check, and a mailbox key. At Banther's request, Schmitz forged Ravers'

name on the check and gave the endorsed check to Banther. Schmitz stayed at the Washington hotel for three days until he returned to Dover on February 14, 1997, to go to work. Banther drove Schmitz back to Dover in Schmitz's Dakota pickup truck.

On February 21, 1997, his birthday, Schmitz took a pawn slip for Banther's ring to a Dover pawn shop to try to retrieve Banther's ring. When the Delaware State Police interviewed Schmitz about Banther's whereabouts, Schmitz said he did not know where Banther was. The State Police also asked Schmitz where his truck was, and Schmitz falsely stated that it was parked at a trailer park near the Dover Air Force Base. When asked at trial why he gave false information to the police, Schmitz answered: "I was scared stiff. I had just—I was involved with Mr. Ravers' murder . . . I just wanted my truck and money back at that time."

Banther and Schmitz buried Ravers in a shallow grave near Godwin, North Carolina. Banther purchased a shovel and Schmitz dug the grave. After the two removed the body from the car trunk, Banther started chopping at Ravers' legs with the shovel. On March 4 or 5, 1997, following the burial of Ravers' body, Schmitz turned himself in as AWOL at Andrews Air Force Base in Washington, D.C.

### Conspiracy Theory Properly Eliminated

In this appeal, Banther argues that the trial judge's failure to properly focus the jury by giving a preliminary limiting instruction was a violation of this Court's mandate and constitutes reversible error. In Banther's 2005 direct appeal, this Court held "that because both the conspiracy and accomplice-liability statutes contain an 'agreement' element, the earlier conspiracy acquittal precluded the State, as a matter

of law, from arguing that Banther *agreed to aid* his co-defendant and identified principal, John Schmitz, in 'planning' the murder in order to establish accomplice liability." [15]   In our 2005 opinion, we stated:

> The earlier jury must have rejected the fact of an agreement between Banther and Schmitz, to find Banther not guilty of conspiracy to murder Ravers. As a consequence, the State was collaterally estopped from advancing an accomplice-liability theory predicated on Banther agreeing to aid Schmitz in planning the murder.[16]

Prior to Banther's third trial, he filed a motion to dismiss the indictment, or in the alternative to limit evidence and argument. The trial judge denied the defense motion to dismiss the indictment. But, the trial judge did grant, in part, Banther's "alternative request to preclude the State from presenting evidence or argument at trial from which the jury may infer that a conspiracy to commit murder existed between the defendant and Schmitz." [17]

Following that ruling, Banther was aware that the State intended to introduce the same evidence during his third trial that was used at Banther's previous two trials for the purpose of establishing Banther's *accomplice liability* for Ravers' death. In this appeal, Banther acknowledges that prior "[e]vidence repeatedly linked Banther and Schmitz to the murder weapon, the murder scene, the vehicles involved, the potential motive, the murder victim, and established that Banther and Schmitz were personally close friends." The record reflects that the State's evidence at Banther's first and second trials did not include any direct proof of planning but simply provided the circumstan-

tial basis for the State to make a planning argument. Therefore, Banther asked the trial judge to instruct the jurors in advance "that they may not interpret the State's argument or any evidence to follow as suggesting any agreement or conspiracy between John Schmitz and Bruce Banther to kill Dennis Ravers." The trial judge denied that motion.

The record reflects that, in accordance with our mandate, the State did not present any evidence or argument that Banther and Ravers agreed or planned *in advance* to kill Ravers. The State's evidence from Banther's prior two trials was properly used to support the State's argument that Banther was liable for Ravers' death as an accomplice to Schmitz after Schmitz began to attack Ravers. Accordingly, there is no merit to Banther's argument that the Superior Court permitted the State to introduce either evidence or argument that violated our mandate.

### Banther as Schmitz's Accomplice

Banther's next argument is that there was no record evidence to support the State's theory that Banther was Schmitz's accomplice. Therefore, Banther submits that the trial judge erred, as a matter of law, by denying Banther's motion for a judgment of acquittal as to any potential liability for Banther as an accomplice to Schmitz. Banther correctly states in his opening brief, however, that with the exception of Schmitz's testimony, the State presented substantially the same evidence in the 2008 trial as in the 2004 and 1998 trials.

This acknowledgment by Banther is significant because in our 2005 decision, we

15.   *Banther v. State*, 884 A.2d 487, 489 (Del. 2005).

16.   *Banther v. State*, 884 A.2d at 494 (citations omitted).

17.   *State v. Banther*, 2006 WL 2337355, at *2 (Del.Super.Ct. July 18, 2006).

concluded that it was appropriate to give an accomplice liability instruction at Banther's 2004 trial but that the instruction which was given should have been more limited in scope: [18]

> To fully implement the collateral estoppel effects of the conspiracy acquittal and to protect Banther's Constitutional right against double jeopardy, the trial judge should have limited the State to arguing that Banther's actions alone, independent of any agreement or "working with" Schmitz, constituted "counsel[ing]" or "attempt[ing] to aid" Schmitz. In his jury instructions, furthermore, the trial judge should have accounted for the earlier acquittal by tailoring the jury charge to exclude any reference to a bilateral agreement between the parties. The earlier jury finding that Banther and Schmitz *did not agree* in advance to kill Ravers—a finding implicit in the conspiracy acquittal—removed that issue from the jury's consideration at the second trial. [19]

The State argues that because of the similarity of the evidence, since we held that a limited accomplice liability instruction would have been appropriate at Banther's 2004 trial, it was proper for the Superior Court, at Banther's 2008 trial, to give a limited accomplice liability instruction of the type which was described in our 2005 opinion. We agree.

■ The record reflects that there was a rational basis in the evidence for the Superior Court to instruct the jury as to Banther's accomplice liability in the 2008 trial. In our 2005 opinion, we noted:

> An accomplice, on the other hand, may act unilaterally, without a preexisting agreement, by spontaneously deciding to aid, counsel, or attempting to aid

another, *or* by agreeing to aid a principal in planning or committing a crime.

In *State v. Travis,* the Superior Court stated that the "use of the [disjunctive] *or* instead of the conjunctive *and* " in the accomplice statute "implicitly recognized accomplice liability based on [a defendant's] unilateral decision to aid in the commission of an offense." We agree that the use of the disjunctive *or* in the accomplice-liability statute allows the jury to find that a defendant either "aided" or "counseled" another without actually "agreeing" to do so in advance. [20]

Banther gave a detailed description in a taped statement that was played for the jury of how a physical fight broke out between Schmitz and Ravers at the Mesibov Road crime scene, and how Schmitz then killed Ravers with the axe. Banther's description of what happened is consistent with a *Travis*-type scenario, to wit, an intentional killing that occurred during a sudden argument or confrontation and was not premeditated. [21]

On the basis of Banther's taped statement and other evidence presented at the third trial, the jury could rationally have concluded that, if Schmitz did hit Ravers with an axe, Banther was his accomplice. The jury could have accepted Banther's description of how the killing began, but rejected Banther's claim that he had no involvement in the murder and, instead, concluded that Banther either "aided" or "counseled" Schmitz at the time of the attack on Ravers without actually "agreeing" to do so in advance. Accordingly, there was a rational basis in the evidence at Banther's third trial for the trial judge to give an accomplice liability instruction.

**18.** *Banther v. State,* 884 A.2d 487, 494–95 (Del.2005).

**19.** *Id.* at 495.

**20.** *Id.* at 493 (citations omitted).

**21.** *See Travis v. State,* 1993 WL 541923 (Del. Supr. Dec.22, 1993).

■ In a related argument, Banther contends that the accomplice liability instruction at his third trial "still permitted the jury to infer an agreement between Schmitz and Banther which was not a permitted inference under any circumstance." As we stated in our 2005 opinion, "[a]lthough a determination to give a particular jury instruction lies within the sound discretion of the trial judge, a defendant enjoys the 'unqualified right' to a correct statement of the law." [22] The record does not support Banther's argument. The record reflects that the jury instructions on accomplice liability at Banther's third trial "correctly stated the law and enabled the jury to perform its duty." [23]

### Evidence that Banther Acted as a Principal

■ Unlike at Banther's first two trials, the jury at the 2008 trial heard testimony from Schmitz, who stated that he was an eyewitness to the February 12, 1997, murder of Ravers. Schmitz testified that he was standing nearby when he observed Banther strike Ravers in the head with an axe. After a second axe blow, Ravers was staggering and when a third axe blow sunk into his head, Ravers fell to his hands and knees. At that point, according to Schmitz's trial testimony, "Bruce looked up at me and said, 'He won't die.' And then he swung the axe down with both hands with a grunt and hit him." Schmitz stated that after the fourth axe blow struck the top of Ravers' head, Ravers fell to the ground.

Schmitz admitted in his 2008 trial testimony that after Banther struck Ravers four times in the head with an axe, Schmitz helped Banther put the still-living Ravers in a big green trash bag and the

two men then carried Ravers to the back of Schmitz's pickup truck. According to Schmitz, he heard "a rasping breath" as Ravers struggled to breathe. Schmitz and Banther then drove in separate vehicles to a nearby location where the two men removed Ravers from the back of the pickup truck and dumped him head first into a 55–gallon steel drum barrel.

Ravers was still breathing at this time. Schmitz again described Ravers' breath as "hard, rasping breath, labored breathing." Banther attempted to burn Ravers in the barrel and tried to knock air holes in the barrel because the body was not burning. Schmitz admitted that he took the claw hammer out of Banther's hands "and made the air holes myself." Banther poured gas on the fire.

According to the State, there was evidence that after the axe blows were inflicted by Banther, both Schmitz and Banther worked together to burn the body of a still-breathing Ravers, thereby causing his death. The State submits, however, there was no basis in Schmitz's trial testimony for the jury to infer that Schmitz and Banther agreed in advance to kill Ravers in 1997. In fact, on cross-examination, Schmitz reiterated that there was no advance agreement or plan for him and Banther to kill Ravers. But, when asked by defense counsel if he did "anything to kill Dennis Ravers," Schmitz responded: "I put him in the burn barrel while he was still breathing."

Based upon Schmitz's trial testimony, a rational trier of fact could conclude that Banther caused Ravers' death as a principal by first striking the victim in the head with an axe and then, in conjunction with Schmitz, dumping Ravers in a metal barrel and igniting it. If the jury believed

**22.** *Banther v. State*, 884 A.2d at 492–93 (citing *Carter v. State*, 873 A.2d 1086, 1088 (Del. 2005); *Bordley v. State*, 2003 WL 22227558, at *2 (Del.Supr. Sept.24, 2003)).

**23.** *Id.* at 493, 832 A.2d 1250 (quoting *Cabrera v. State*, 747 A.2d 543, 545 (Del.2000)).

Schmitz's trial testimony, there was a basis to conclude that Banther was liable as a principal and Schmitz was liable as an accomplice to Banther for at least hastening Ravers' death by placing a plastic bag over his head and then shoving him, still breathing, into the burn barrel.[24]

### Schmitz's Testimony Admissible

■ Schmitz did not testify as a witness at Banther's two prior Superior Court trials in 1998 and 2004. At Banther's third trial, the defense objected when the State informed the trial judge that the next prosecution witness would be Schmitz. Specifically, defense counsel stated: "Your Honor, we object to the State presenting that testimony from Mr. Schmitz on grounds of fundamental fairness, due process, issue preclusion, collateral estoppel, Disciplinary Rule 3.3 and claimed forfeiture."

Banther's anticipatory evidentiary objection to Schmitz's trial testimony was based on a review of a June 14, 2007, taped statement given by Schmitz to a Delaware State Police detective. Defense counsel argued: "The State has provided us with a statement which Mr. Schmitz gave in 2007 which they ... expect is going to be consistent with his testimony, and basically is going to be that Mr. Schmitz did nothing wrong; that he did not participate in the murder of Dennis Ravers, but not surprisingly, that Mr. Banther unilaterally did this." After hearing argument from counsel, the trial judge overruled the defense objection, and Schmitz was permitted to testify.

In this appeal, Banther argues that the State violated his due process rights "under both the Delaware and United States Constitutions" by asserting a new theory of criminal responsibility—i.e., that Banther was criminally liable as a principal—at Banther's 2008 retrial. In his opening brief, Banther also states: "The entirely new theory of the case was inconsistent with the State's previous position in both earlier Banther trials and Mr. Schmitz's prosecution that there had been [a prior] agreement between John Schmitz and Bruce Banther to murder Dennis Ravers." By asking the trial judge to exclude Schmitz's testimony in its entirety, Banther was relying on the doctrine of judicial estoppel.[25]

■ Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." [26] "The primary concern of the doctrine of judicial estoppel is to protect the integrity of the judicial process." [27] The doctrine is narrowly construed and is rarely applied against the government in criminal prosecutions.[28] To invoke the doctrine

---

**24.** *See Oxendine v. State*, 528 A.2d 870, 872–73 (Del.1987) (explaining that one "causes" the death of another when his acts hasten or accelerate that death); *see also State v. Montoya*, 133 N.M. 84, 61 P.3d 793, 799 (2002) (stating that "a defendant is liable for the victim's death if his act hastens the victim's death"); *State v. Cumming*, 634 A.2d 953, 956–57 (Me.1993).

**25.** *See People v. Coffin*, 305 Ill.App.3d 595, 238 Ill.Dec. 805, 712 N.E.2d 909, 911 (1999); Kimberly J. Winbush, Annotation, *Judicial Estoppel in Criminal Prosecution*, 121 A.L.R. 5th 551, 565 (2004). *See also* Anne Bowen Paulin, *Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its*

*Story Straight*, 89 Cal. L.Rev. 1423, 1425 (2001) ("Unfortunately the law has no clear response to the problem of prosecutorial inconsistency.").

**26.** *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *see United States v. Grap*, 368 F.3d 824, 831 (8th Cir.2004).

**27.** *United States v. Levasseur*, 846 F.2d 786, 792–93 (1st Cir.1988).

**28.** *See United States v. Grap*, 368 F.3d at 831; *Nichols v. Scott*, 69 F.3d 1255, 1268–74 (5th Cir.1995); *United States v. Owens*, 54 F.3d 271, 275 (6th Cir.1995); *United States v. Kat-*

of judicial estoppel, some courts require a preliminary showing of manipulation, fraud or bad faith by the government.[29]

The record reflects that there was no basis to invoke the doctrine of judicial estoppel in Banther's case because the State did not engage in manipulation, fraud or bad faith in presenting Schmitz's testimony. At trial, the prosecutor responded to each of Banther's arguments, including the accusation of ethical impropriety. The trial judge accepted the State's explanation of the circumstances surrounding Schmitz's willingness to testify at Banther's third trial.

In Banther's case, the record reflects no reason for the trial judge to invoke judicial estoppel and prevent the jury from hearing highly relevant eyewitness testimony.[30] Schmitz's willingness to testify at Banther's third trial was evidence the State was entitled to present for the jury's consideration. The trial judge's evidentiary ruling permitting Schmitz's testimony was not an abuse of discretion and Banther has demonstrated no federal Constitutional due process violation.[31]

## Principal or Accomplice Alternative Theories Permitted

◼ Banther and Schmitz each accused the other of hitting Ravers with an axe. Banther argues that the State could not present both the testimony of Schmitz and the prior statements by Banther to advance inconsistent, alternative theories of Banther's criminal liability for Ravers' death as either a principal or an accomplice. Banther submits that the State had to either elect a theory of Banther's liability as an accomplice, based on Banther's prior statements and the other evidence presented at the first two trials; or, as a principal, based on Schmitz's testimony at the third trial.

In *Charbonneau v. State*, this Court addressed the issue of inconsistent statements by two co-defendants who each asserted that the other inflicted the fatal blows.[32] In *Charbonneau*, we held that "the trial judge abused his discretion by endorsing as fact the State's unilaterally held view that one witness's version of the facts, purportedly offered truthfully in support of a plea agreement accepted by the State, was credible, while another witness's version, similarly accepted by the State as truthful, was not." [33] We further

*tar,* 840 F.2d 118, 127–30, n. 7 (1st Cir.1988) (stating that "as far as we can tell, this obscure doctrine has never been applied against the government in a criminal proceeding"); *Smith v. State,* 765 N.E.2d 578, 583 (Ind. 2002); *Stinson v. State,* 256 Ga.App. 902, 569 S.E.2d 858, 860 (2002).

**29.** *See generally United States v. Shea,* 150 F.3d 44, 52 (1st Cir.1998); *United States v. McCaskey,* 9 F.3d 368, 378–79 (5th Cir.1993) (citing Mark J. Plumer, Note, *Judicial Estoppel: The Refurbishing of a Judicial Shield,* 55 Geo. Wash. L.Rev. 409, 434 (1987); Rand G. Boyers, Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel,* 80 Nw. U.L.Rev. 1244, 1348 (1986)); Kimberly J. Winbush, Annotation, *Judicial Estoppel in Criminal Prosecution,* 121 A.L.R. 5th at 573–75.

**30.** *See generally Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674

(1986) (stating that "the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence").

**31.** *See United States v. Sharpe,* 193 F.3d 852, 872 (5th Cir.1999) ("Regarding the defendants' contention that the government changed its theory, we view the government's presentation of the evidence not as a due process violation but merely as the presentation of new and significant evidence that justified the prosecution in question."). Banther's suggestion that the Delaware Constitution was violated was waived because he did not brief or argue that issue. *See Ortiz v. State,* 869 A.2d 285, 290–91 (Del.2005).

**32.** *Charbonneau v. State,* 904 A.2d 295 (Del. 2006).

**33.** *Id.* at 304.

held that the trial judge abused his discretion in making certain evidentiary rulings "by removing from the jury the issue of who spoke truthfully."[34]

Banther admits that the central issue at his third trial was the choice the jury was asked to make with respect to who struck the fatal blows—Banther or Schmitz. Banther also acknowledges there was not a more important aspect of this case than who to believe, because both Schmitz and Banther told mirror image stories accusing the other of the murder. Each, however, also had credibility problems. Banther told multiple stories about the circumstances of the homicide and Schmitz admitted that he had previously lied about his involvement to investigators, his military superiors, his family, his lawyers, his psychiatrist, and while under oath.

The record includes an exchange between the State and the trial judge in connection with the defense's motion to dismiss the indictment against Banther, presented months before the trial. The State acknowledged the inconsistency between Banther's statements and Schmitz's pretrial statement, and also candidly admitted that it did not "know for sure" who hit Ravers with the axe.

> **The Court:** Hypothetically speaking, if the State is not permitted to prove an agreement and can't establish which of the two co-defendants committed the offense, how does the State persuade the jury beyond a reasonable doubt that one did it rather than the other?
>
> **The State:** [W]ell, we don't know which one did it. We know that they were both at the scene and that it ended up that it was an intentional murder. I mean, obviously, the State can't take a

position as to which one did it. . . . [W]e don't know for sure which defendant struck Mr. Ravers with the axe.

Although the State did not know with certainty who hit Ravers with the axe, the State consistently asserted that after either Banther or Schmitz wounded Ravers, both were involved with his death.

■ It is well established that a defendant who is indicted as a principal can be convicted as an accomplice and vice versa, if the evidence presented at trial supports the alternative basis for criminal liability.[35] Moreover, in vicarious criminal liability prosecutions, involving one incident and two people, it is unnecessary for the State to establish which of the participants in the crime actually wielded the murder weapon.[36] As long as it can be established that one of the participants struck the fatal blow or fired the fatal shot and that the participants were engaged in a joint criminal endeavor, there is a sufficient evidentiary basis to impose criminal liability upon all of the participants.[37]

When multiple individuals are charged with involvement in the same criminal activity, they frequently blame one another and give inconsistent accounts of their own actions and each other's conduct. Accordingly, in Banther's case, the trial judge's charge to the jury included the following two standard instructions:

> You are the sole judge of the credibility of each witness (including the defendant) and of the weight to be given to the testimony of each. You should take into consideration each witness' means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of his/her

---

34. *Id.* at 307.

35. *Probst v. State,* 547 A.2d 114, 123 (Del. 1988); *see* Del.Code Ann. tit. 11, § 275.

36. *Id.* at 123; *see* Del.Code Ann. tit. 11, § 275.

37. *Id.; see* Del.Code Ann. tit. 11, § 275.

testimony; the consistency of inconsistency of his/her testimony; the motives actuating him/her; the fact, if it is a fact, that his/her testimony has been contradicted; his/her bias, prejudice, or interest, if any; his/her manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the credibility of his/her testimony.

\* \* \*

If you find the testimony to be conflicting by reason of inconsistencies, it is your duty to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But, if you cannot do this, then it is your duty and privilege to give credit to that portion of the testimony which, in your judgment, is most worthy of credit and disregard any portion of the testimony which, in your judgment, is unworthy of credit. In so doing, you should take into consideration the demeanor of the witnesses as they testified before you, their apparent fairness in giving their testimony, their opportunities for learning and knowing the facts about which they testified, and any bias or interest that they may have concerning the outcome of this case.

If the jurors believed Schmitz' testimony, Banther hit Ravers with an axe and was guilty as a principal. Assuming that the jury did not believe Schmitz's testimony at the 2008 trial, and that the jury concluded from Banther's statements that Schmitz was the principal who hit Ravers with the axe, there was sufficient evidence from which the jury could have concluded that Bather was Schmitz's accomplice. The jurors, however, were not required to decide which defendant was the principal and which was the accomplice,[38] as long as they were satisfied that Banther and Schmitz acted together to kill Ravers and that one of them was the principal and one of them was the accomplice.[39]

In the prosecutions of Adam Norcross and Ralph Swan, for example, the State never was able to establish which of the two home invaders actually fired the fatal shot, but, because evidence established the joint activity of both defendants, that question did not have to be definitively resolved by the jury in order to convict each defendant in his separate trial for the murder.[40] In *Swan*, this Court stated:

> Swan and Norcross were engaged in the same enterprise, at the same time and cannot escape liability simply because the State cannot prove which defendant inflicted the fatal wound. The jury need not unanimously decide whether Swan fired the fatal shot where both theories of liability required the jury to determine that Swan participated in the robbery and was one of the assailants that fired a weapon.[41]

Accordingly, we hold that the State was entitled to present the prior statements by Banther and the testimony of Schmitz to support its theory that either Banther or Schmitz was the principal and that Banther and Schmitz worked together to complete Ravers' murder after that crime started.[42]

**38.** Del.Code Ann. tit. 11, § 275; *Ayers v. State*, 844 A.2d 304, 308 (Del.2004); *Liu v. State*, 628 A.2d 1376, 1386–87 (Del.1993); *Probst v. State*, 547 A.2d at 120–22.

**39.** *Swan v. State*, 820 A.2d 342, 357–58 (Del. 2003).

**40.** *See Norcross v. State*, 816 A.2d 757 (Del. 2003); *Swan v. State*, 820 A.2d 342 (Del. 2003).

**41.** *Swan v. State*, 820 A.2d at 357.

**42.** *See id.* at 357–58.

### Hearsay Evidence Admissible Confrontation Right Not Violated

■ At the 2008 trial, Banther objected to the admission of statements from four witnesses—dispatcher Cheryl Knotts–Woods, Detective John Evans, military police officer Mark Habicht and pawnbroker Earl West—as hearsay evidence that violated the accused's confrontation rights as defined by the United States Supreme Court in *Crawford v. Washington*.[43] *Crawford* restricts the use of prior "testimonial" out-of-court statements of unavailable declarants.[44] *Crawford* overruled *Ohio v. Roberts*[45] with regard to "testimonial" out-of-court statements of a non-appearing declarant, but it did not eliminate all traditional hearsay exceptions[46] as Confrontation clause violations. Non-testimonial statements, for example, do not implicate the Confrontation Clause and are subject only to the State's traditional hearsay rules.[47] We will address each of the contested statements *seriatim*.

■ First, Ravers' statement to pawnbroker Earl West that he wanted only $5 for a ring pawn was not "testimonial" and was correctly admitted under the state of mind hearsay exception.[48] Second, *Crawford* also was not implicated in Banther's hearsay objection to the trial testimony of military police officer Mark Habicht that: (1) his wife wrote down a license plate number on a truck that Ha-

bicht and his wife both saw Banther driving and (2) when Habicht called the law enforcement desk at the base to check the license plate number, he was advised that the plate was registered to John Schmitz. Habicht observed the truck at the same time his wife wrote down the tag number, so his testimony about the number is a present sense impression,[49] even if his wife was the one who actually wrote down the number. Also, a police officer is permitted to relate motor vehicle registration information received from registration authorities because public records are recognized as hearsay exceptions under D.R.E. 803(8), and the registration information is not "testimonial" in nature.[50]

■ Banther's third objection relates to the trial testimony of State Police Detective John Evans in reference to a police radio statement by Delaware State Police Lieutenant W. Thomas Ford that he was maintaining surveillance of Bruce Banther and that Banther had stopped on U.S. 301 on the Eastern Shore of Maryland to use a pay phone. In overruling Banther's *Crawford* objection to Evans' testimony, the trial judge relied upon the State's representation that Ford was going to testify to the same thing the next day. The record reflects that Ford did appear the next day and testified to the same information related by Evans. When the declarant is available for cross-examination, an accused is not denied his confrontation right.[51] Banther's defense counsel

---

43. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

44. *Id.*

45. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

46. D.R.E. 803(1)-(25).

47. *Sanabria v. State*, 974 A.2d 107, 2009 WL 1362278, at *7 (Del.Supr. May 15, 2009) (citing *Crawford v. Washington*, 541 U.S. at 68, 124 S.Ct. 1354); *Jones v. State*, 940 A.2d 1, 13

(Del.2007) (citing *Crawford v. Washington*, 541 U.S. at 68, 124 S.Ct. 1354).

48. *See* D.R.E. 803(3).

49. D.R.E. 803(1).

50. D.R.E. 803(8); *see Archy v. State*, 2009 WL 1913582, at *3 (Del.Supr. July 6, 2009) (citing *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

51. *See Sanabria v. State*, 974 A.2d 107, 117 (Del.Supr.2009) (explaining that the Confron-

was afforded an opportunity to cross-examine Ford and had no questions for the witness.

■ Finally, Ravers' telephone and in-person communications to Harrington Police dispatcher Cheryl Knotts–Woods are not "testimonial" in nature and were admissible as hearsay exceptions for present sense impression and existing mental or emotional condition.[52] Unlike other police contacts that might generate "testimonial" responses, Ravers' statements were not part of any judicial proceeding[53] and no crime had been committed at the time they were given.[54] Therefore, the victim's remarks were not in response to a police interrogation.[55] Accordingly, we hold that

the trial judge's ruling that Ravers' statements to the police dispatcher were "not testimonial" is correct. We also hold that there was no abuse of discretion in this evidentiary ruling. It was harmless beyond a reasonable doubt.

■ The information related by Knotts–Woods—that Ravers was meeting with Banther and a third individual named "Charles" to discuss resolution of Banther's debt to Ravers—was ultimately cumulative to other evidence in the case.[56] First, in Banther's statement to North Carolina Special Agent Timothy Thayer, Banther admitted being with Ravers the night the victim was killed. Second, at the 2008 retrial, the jury heard Schmitz testify

---

tation Clause is implicated only when "the defendant does not have an opportunity to confront the out-of-court declarant," such as "where the declarant does not testify at trial," even though available, and is not subject to cross-examination) (citing *Crawford v. Washington*, 541 U.S. at 68, 124 S.Ct. 1354).

**52.** D.R.E. 803(1), (3); *Archy v. State*, 2009 WL 1913582, at *3 (explaining that a statement is testimonial when "the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" and that a statement is nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency") (quoting *Davis v. Washington*, 547 U.S. at 822, 126 S.Ct. 2266); *Sanabria v. State*, 974 A.2d 107, 117 (stating that "the admission of nontestimonial statements does not implicate the Confrontation Clause and instead is governed by the jurisdiction's evidence rules") (citing *Crawford v. Washington*, 541 U.S. at 68, 124 S.Ct. 1354).

**53.** *See Fahmy v. State*, 2006 WL 2842726, at *3 n. 16 (Del.Supr. Oct.5, 2006) (explaining that the Confrontation Clause "applies to witnesses who give testimony against the accused," such as " 'ex parte in-court testimony

or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' ") (quoting *Crawford v. Washington*, 541 U.S. at 51, 124 S.Ct. 1354).

**54.** *See Fahmy v. State*, 2006 WL 2842726, at *3 (explaining that "[t]he statements of which defendant complains were made by [a] codefendant ... to the victim before the commission of the crime" and "are not testimonial in nature") (citing *Crawford v. Washington*, 541 U.S. at 51, 124 S.Ct. 1354); *see also Archy v. State*, 2009 WL 1913582, at *3; *Sanabria v. State*, 974 A.2d 107, 117.

**55.** *See id.; see also Davis v. Washington*, 547 U.S. at 821–29, 126 S.Ct. 2266.

**56.** *Compare Sanabria v. State*, 974 A.2d 107, 120 (holding that trial judge's error in admitting dispatcher's out-of-court statements was not harmless because the statements "were not merely cumulative evidence" and "likely were a principal factor in [the defendant's] conviction"), *with Johnson v. State*, 587 A.2d 444, 451 (Del.1991) *(en banc)* (holding that trial judge's error in admitting police officer's testimony that a confidential informant had identified the defendant was harmless because "[w]hile the out-of-court statement was highly incriminating to the defendant, it [wa]s merely cumulative in the State's case against

that Banther owed Ravers money and that Schmitz was present on February 12, 1997, when Banther struck Ravers in the head with an axe four times. Given this other trial evidence, Knotts–Woods' testimony about Ravers' statements regarding his meeting with Banther was cumulative. Therefore, in the alternative, we hold that if the admission of Knotts–Woods' statements violated his right to confrontation under *Crawford*, those errors were harmless beyond a reasonable doubt in this case.[57]

### State's Closing Arguments

■ ■ In this appeal, Banther challenges the propriety of two remarks made by the prosecution during closing arguments. During the State's summation, the prosecution presented the following argument to the jury concerning Ravers' death:

> You are sitting there right now—you are sitting there doing nothing but listening to me argue. But if you stop for a moment, you will notice you are all drawing your breath out. Concentrate on that for a second. Mr. Schmitz said that's the same thing Dennis Ravers was doing in between those two trucks when they picked up his bloodied body and they carried him to the Dakota. It's the same thing.

The defense's timely objection was sustained, with the trial judge admonishing the prosecution that "this is not a jury participation argument." In lieu of granting Banther's motion for a mistrial, however, the trial judge instructed the jury to disregard the argument as improper and not to let it influence their deliberations.

Banther's jury was told by the presiding judge: "I instruct you that that is improper closing argument, and you should completely disregard that argument that referred to you and Mr. Ravers in that fashion and not allow it to influence your deliberations in any way." The State argues that this prompt contemporaneous jury instruction was a sufficient remedy and did not call undue attention to the prosecutor's improper comment.

■ ■ ■ Whether a mistrial should be declared lies within the trial judge's discretion.[58] This grant of discretion recognizes the fact that the trial judge is in the best position to assess the risk of any prejudice resulting from trial events.[59] When a trial judge denies a mistrial application, that decision will be reversed on appeal only if it is based upon unreasonable or capricious grounds.[60] "A trial judge should grant a mistrial only where there is a 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[61] The remedy of a mistrial is "mandated only when there are 'no meaningful and practical alternatives' to that remedy."[62] Every mis-

him, and it did not have important relevance as an explanation for police conduct").

57. *Capano v. State*, 781 A.2d 556, 618–23 (Del.2001) (stating that the erroneous admission of hearsay is harmless when the evidence is cumulative of other properly admitted testimony).

58. *See Burns v. State*, 968 A.2d 1012, 1018 (Del.2009); *Ashley v. State*, 798 A.2d 1019, 1022 (Del.2002); *Steckel v. State*, 711 A.2d 5, 11 (Del.1998).

59. *See Burns v. State*, 968 A.2d at 1018 (citing *Revel v. State*, 956 A.2d 23, 27 (Del.2008)); *Ashley v. State*, 798 A.2d at 1022; *see also*

*Hope v. State*, 570 A.2d 1185, 1189 (Del.1990); *Bowe v. State*, 514 A.2d 408, 410 (Del.1986).

60. *Zimmerman v. State*, 628 A.2d 62, 65 (Del. 1993) (citing *Chavin v. Cope*, 243 A.2d 694, 699 (Del.1968)); *see Burns v. State*, 968 A.2d at 1018.

61. *Steckel v. State*, 711 A.2d at 11 (quoting *Fanning v. Superior Court*, 320 A.2d 343, 345 (Del.1974)); *see Smith v. State*, 913 A.2d 1197, 1220 (Del.2006). *Accord Bailey v. State*, 521 A.2d 1069, 1075–77 (Del.1987).

62. *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994) (quoting *Bailey v. State*, 521 A.2d at 1077); *see Burns v. State*, 968 A.2d at 1018.

statement in a jury argument does not amount to prosecutorial misconduct requiring a mistrial.[63]

The "breathing" remark was improper. The trial judge sustained Banther's objection and immediately issued a curative instruction.[64] The jury is presumed to follow the judge's instructions.[65] Accordingly, we hold the prompt jury curative instruction, which did not overemphasize the improper remark, was an appropriate "meaningful and practical alternative" to a mistrial in Banther's case.[66]

Banther's second challenge to the State's closing arguments concerns a statement made in rebuttal about Schmitz and accomplice liability. In reference to Schmitz's prior guilty plea to Murder in the Second Degree, the prosecutor stated in rebuttal: "You can plead guilty if you're an accomplice or if you're a principal." Following this general statement, defense counsel objected and said that the State was attempting to argue that Schmitz "may have pled guilty as an accomplice to Mr. Banther in 1999. And there's no evidence whatsoever of that according to Mr. Schmitz's story or what Mr. Banther said in any of his statements or according to any of the evidence."

In overruling the defense objection to that closing comment by the prosecution in rebuttal, the Superior Court judge recognized that there was record evidence to support the State's theory of accomplice liability for Schmitz by observing, "for one thing, Mr. Schmitz's own testimony said that he helped move [Ravers] to the burial site, and when he was put in the barrel, he was still breathing. Mr. Schmitz kind of made a point of that. He felt that implicated him."

In a related argument, Banther accuses the prosecutor of ethical impropriety in presenting Schmitz's testimony that Ravers was still breathing after being struck in the head with an axe four times when "the State adopted a portion of John Schmitz's testimony they knew to be untrue and used it as the foundation to paint Schmitz as an accomplice by agreement." Banther contends that the "prosecutors knew Schmitz's claim that Ravers was alive was false." The accusation that the State knowingly presented false testimony and then used that evidence in closing argument is not supported by the record.[67]

---

63. See *Kurzmann v. State*, 903 A.2d 702, 708–09 (Del.2006) (citing *Daniels v. State*, 859 A.2d 1008, 1011 (Del.2004)). *See, e.g., Drumgo v. State*, 2009 WL 1886694 (Del.Supr. July 1, 2009).

64. See *Allen v. State*, 970 A.2d 203, 215–16 (Del.2009) (explaining that "when dealing with potential prosecutorial misconduct, '[i]f defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial, or if the trial judge intervened and considered the issue *sua sponte*, we essentially review for harmless error'") (quoting *Justice v. State*, 947 A.2d 1097, 1100 (Del.2008); *Baker v. State*, 906 A.2d 139, 148 (Del.2006)); *see also Pena v. State*, 856 A.2d 548, 551 (Del.2004). *See generally Smith v. State*, 913 A.2d at 1213–15.

65. *Michaels v. State*, 970 A.2d 223, 229 (Del. 2009) (citing *Guy v. State*, 913 A.2d 558, 565–66 (Del.2006)).

66. See *Kurzmann v. State*, 903 A.2d at 708–09 (citing *Daniels v. State*, 859 A.2d at 1011).

67. See, e.g., *Yelardy v. State*, 2008 WL 450215, at *3 (Del.Supr. Feb.20, 2008) *(en banc)* (dismissing the defendant's claim of prosecutorial misconduct because the defendant "does not provide a basis for his claim that the prosecutor knowingly solicited false testimony"); *Booze v. State*, 2007 WL 445969, at *5 (Del. Supr. Feb.13, 2007) (explaining that the record reflects that the prosecutor's statement in closing "was a reasonable inference that can be drawn from the evidence presented at trial and was not a false statement or misrepresentation of fact"); *Kurzmann v. State*, 903 A.2d at 712 (holding that "the prosecutor's comments might be hyperbolic argument, in which the prosecutor made legitimate inferences from the evidence at ... [trial], but they are supported by the record, are not misstatements, and, in context, are not improper in any way").

892

Dr. John Butts, the North Carolina Medical Examiner who performed a March 14, 1997, autopsy of Dennis Ravers' decomposed body, testified that the cause of death was "the head injury," but added that it was possible that Ravers could have continued to breathe "for a while" after the axe blows were inflicted. This expert testimony supports Schmitz's assertions that Ravers was alive when Schmitz joined Banther in completing the fatal incident. Schmitz's assistance in placing a bag over the victim's head and then dumping the still-breathing victim in the burn barrel hastened Ravers' death.[68] Thus, the prosecutor's rebuttal comment was supported by the record. Accordingly, there was no ethical impropriety in arguing that there was evidence to support a theory of criminal liability for Schmitz as an accomplice.

### Conclusion

The judgments of the Superior Court are affirmed.

---

**68.** *See Oxendine v. State,* 528 A.2d 870, 872–74 (Del.1987); *see also State v. Montoya,* 133 N.M. 84, 61 P.3d 793, 799 (2002); *State v. Cumming,* 634 A.2d 953, 956–57 (Me.1993).