Sergio I. GOMEZ, Defendant Below–Appellant,

v.

STATE of Delaware, Plaintiff Below–Appellee.

No. 355, 2010.

Supreme Court of Delaware.

Submitted: May 4, 2011.
Decided: July 28, 2011.

Joseph A. Hurley, Esquire, Wilmington, Delaware, for Appellant.

John Williams, Esquire, of the Department of Justice, Dover, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

Defendant–Below/Appellant, Sergio Gomez, was charged by indictment with two counts of raping his nine-year-old niece. The matter proceeded to a jury trial. During the pretrial conference, the trial

judge ruled that Gomez's prior conviction in New Jersey for a similar sexual offense against Gomez's other niece (the complaining witness's cousin) was inadmissible. But, the complaining witness's mother referred to the commission of that crime during her testimony, which occurred at the very end of the first day of Gomez's trial. Defense counsel moved for a mistrial. The trial judge denied that motion the next morning. The jury ultimately found Gomez guilty of two counts of rape first degree.

On appeal, Gomez contends, among other things, that the trial judge committed reversible error in denying his mistrial motion after the prejudicial testimony was given. We agree. When the jury heard that Gomez had committed a similar sexual offense against Gomez's other niece (the complaining witness's cousin), this gave rise to an impermissible inference that he had committed the offense for which he was being tried. A mistrial was required in the circumstances of this case. Accordingly, the judgments of the Superior Court are reversed and the matter is remanded for a new trial consistent with this Opinion. To provide guidance at that new trial and in other cases, we also comment on additional arguments made by Gomez.

### Facts

When the complaining witness, whom we refer to as S.C., was younger, she often visited her aunt and uncle—Janet Lara and Sergio Gomez—at their home in Smyrna, Delaware. S.C.'s cousins also lived at that home. During at least one visit, S.C. allegedly encountered her Uncle Sergio on the stairs. S.C. recalled: "My aunty's husband did something wrong to me and I didn't like it." S.C. was five years old at the time of the alleged incidents. S.C. eventually revealed those incidents to her mother. Thereafter, at the Delaware Child Advocacy Center (the "CAC"), S.C. told a forensic interviewer that her Uncle Sergio had touched her "private part." Gomez was then charged by indictment with two counts of rape first degree. The matter proceeded to a jury trial.

### Pretrial Conference

Several significant rulings occurred at the pretrial conference. First, the trial judge and the prosecutor discussed the possibility of playing the video of the CAC interview for the jury as follows:

The Court: Do you think [S.C. will] be able to testify in the courtroom?

Prosecutor: I don't know. That's my— that's something that is hard to judge.

\* \* \*

The Court: The only thing I would ask that you think about is if she is able to testify concerning the events as displayed on the tape, it seems redundant to have the [tape] played again. So I would prefer that we see how that plays out, because if it becomes unnecessary, it just delays the process.

Second, the prosecutor informed the trial judge that he had arranged for an interpreter to be available when S.C. and S.C.'s mother testified. The prosecutor explained:

I've been dealing with them without an interpreter, and it's been going pretty well. I'd like to have the interpreter here as just kind of a backup if she gets hung up. I don't think she needs to sit here and interpret every single thing that's said.

Third, the prosecutor moved to allow S.C.'s mother to sit in the courtroom as a support person while S.C. testified. The trial judge and the prosecutor discussed that special accommodation as follows:

The Court: I think it's appropriate with the age of the child to allow the mother to sit in, but only during her testimony.... [D]uring the child's testimony, I will allow her here to give support to a young child.

Prosecutor: Your Honor, this is the first time I've done the support person. Would you like to have her, the mother, appear prior to testimony so that you can caution her about not speaking?

The Court: That probably would be appropriate, so before the—I would think that when we get to the point where the young child is going to be the witness, we would put her on the witness stand without having to walk in front of the jury; and we can bring the mother in at that point in time with the child, and I'll make the comments to her.

Finally, the trial judge addressed Gomez's prior conviction in New Jersey for a similar sexual offense against S.C.'s cousin and provided guidance to the parties that testimony from witnesses about that offense would raise issues under Delaware Rule of Evidence 404(b).[1] The trial judge determined that the prior conviction was inadmissible.[2]

### The First Day of Trial

After the prosecutor and defense counsel made their opening statements, the trial judge excused the jury for lunch. After the lunch break, but before the jury reentered the courtroom, the following exchange occurred:

Prosecutor: Your Honor, as I spoke to the Court earlier, I think the interpreter is just here in case she gets stuck and needs help, but it's not going to be a word-for-word interpretation at this point.

The Court: That's fine. We're just going to have her sit here, and if she needs help, she can turn to the interpreter.

Prosecutor: Do we need to swear her in front of the jury at that point?

The Court: I don't swear interpreters....

Also before the jury reentered the courtroom, the trial judge engaged in a colloquy with the State's first witness, S.C. After that colloquy, the trial judge instructed S.C. as follows:

All right. Let's bring the jury in. You can sit right there when the jury comes in. And when we do the oath, just sit right where you are and put your hand on that Bible in front of you.

The trial judge also permitted S.C. to hold a teddy bear while she testified.

S.C. testified on direct examination as follows:

Q: Did you ever go to your Aunt Janet's house?

A: Yes.

Q: And who lived there?

A: Her husband.

\*     \*     \*

---

1. D.R.E. 404(b) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."). *See also Getz v. State*, 538 A.2d 726, 734 (Del.1988) (recognizing "unfairness inherent in [ ] indiscriminate use of evidence of prior criminal acts").

2. *State v. Gomez*, 2010 WL 2396934, at \*1 (Del.Super. May 26, 2010) ("The Court had previously ruled that the Defendant's prior conviction in New Jersey for a similar sex offense could not be admitted....").

Q: Did anything happen to you while you were there?

A: Yes.

Q: What happened?

A: My aunty's husband did something wrong to me, and I didn't like it.

\* \* \*

Q: Did your mom take you to [the CAC] to be interviewed by a lady named Miss Diane.

A: Yes.

Q: Do you remember that interview?

A: Yes.

Q: Did you tell the truth during that interview?

A: Yes.

Q: And nobody forced you to say anything at that interview?

A: No.

Q: And what did you talk about during that interview?

A: What my aunt's husband did to me.

Q: Can you tell us a little bit about that right now, what he did?

A: I don't want to say it.

Q: Are you scared?

A: Yes.

Immediately after that testimony, the prosecutor moved to introduce the video of the CAC interview pursuant to title 11, section 3507 of the Delaware Code, but the trial judge agreed with defense counsel that the prosecutor was required to further develop S.C.'s testimony to sufficiently "touch on" the events that S.C. had perceived. S.C. continued to testify as follows:

Q: [During the CAC interview,] did you talk about your uncle touching you at that point?

A: Yes.

\* \* \*

Q: Where did he touch you?

A: My private part.

Q: And you told Miss Diane about that?

A: Yes.

Q: And do you remember telling her what he touched your private with?

A: Yes.

Q: And what was that?

A: I don't want to say it.

Q: It's okay, [S.C.].

A: I don't really want to say it.

\* \* \*

Q: [S.C.], has it been a while since you've seen your aunt's husband?

A: Yes.

\* \* \*

Q: [S.C.], could you take a look in the courtroom today and see if you see your Aunt Janet's husband from that time.

A: I don't want to.

Q: Are you scared?

A: Yes.

The trial judge stated: "I believe a sufficient foundation has been laid." The trial judge then allowed the prosecutor to play the video of the CAC interview, which included a more detailed description of the alleged events, including an account of Gomez kissing S.C.'s "private part." It appears that S.C. testified without the aid of the interpreter.

S.C.'s mother also testified on the first day of Gomez's trial. The record reflects that S.C.'s mother began to testify without the interpreter's aid, but the trial judge stated: "[S]ince we're going to use the interpreter, we're going to ask that you let the question be asked, wait until the interpreter interprets for you, and then you can respond, even if you happen to know what the question is." S.C.'s mother then con-

tinued to testify. At the conclusion of defense counsel's cross examination of S.C.'s mother, the following exchange occurred (emphasis added):

Q: [W]as [your sister's] divorce from Sergio Gomez very bitter and acrimonious?

A: I don't think so, no. She's not the type of person who likes to fight. She's very calm. She likes things to be right. *So she told him that she was leaving him because he had committed a crime, and with not just my daughter, but also my niece.*

Q: Did Janet ever talk to you about her custody situation with her husband Sergio?

A: She only said that she was asking for custody because he could hurt the children and she was scared for them.

Q: My question is she talked to you about the custody issue?

A: There was no problem. She only told me that she wanted the custody of the children so that she could protect them.

Defense counsel then stated: "I have no other questions." At a sidebar conference immediately thereafter, defense counsel stated: "There was evidence about the prior conviction." The trial judge replied: "We'll get to that when we don't have the jury sitting here in front of us." At that time, it was approximately 4:40 p.m. The trial judge excused the jury for the day. The following discussion then occurred:

The Court: During the testimony of the mother, there was a reference to another child. And we—those who are in the courtroom now, the jury has left, we know that—I'm surmising that she's talking about a prior incident that the Court had ruled that it

was not going to let in unless Mr. Sergio Gomez testified.

So I don't know if there is—I don't have an application before me. I don't know if you want to make one. But the record should reflect that the incident occurred.

Defense counsel: I waited until the jury was gone as opposed to approaching sidebar when it occurred.

It's highly prejudicial, Your Honor.

\* \* \*

... I'm going to move for a mistrial based upon the nature of the allegation in this case and the answer as given by the State's witness, which was non-responsive.

\* \* \*

Prosecutor: ... I think either a curative instruction could take care of this or—frankly, I don't see it as inflammatory to an individual who doesn't know about the prior event or the prior conviction.

The Court: Well, it's near the end of the day. I will take the evening to think about it. It is concerning to me, but I'm not confident yet that it rises to the level of a mistrial.

### The Second Day of Trial

The next morning, the trial judge denied Gomez's motion for a mistrial. The trial judge explained from the bench as follows:

I've thought about it over the evening.... And it's hard on a cold record. And I say that so those who may look at this beyond me will maybe appreciate this.

The way that it came into the trial from my perspective was simply that the sister, who is married to the defendant, when there were questions about the custody battle that was going on, the questions and the responses, I think it is

fair to say, reflected that she was concerned about the welfare of the children and, therefore, wanted custody of them.

And the way it came out was that because her sister was told about the incident involving the defendant, she was concerned about all her children.

And since the jury doesn't know of his prior conviction, doesn't know that there was anything of that nature, it is a fair inference from the testimony that this was simply an effort by the sister to protect the children based upon the facts she had been told by the witness of the incident involving her daughter.

So I am not granting the motion for a new trial or a mistrial based upon the testimony of the mother. If she is going to testify again, however, before she gets on, I'll need to tell her a few things.

The following exchange then occurred:

The Court: You want me to give some cautionary instruction? You may, but you need to think about whether it highlights what was said.

Defense counsel: I've thought about it, and I've talked it over with some colleagues, a colleague, and it's extremely close, Judge.

\* \* \*

The Court: I can perhaps say, if you wanted me to, that the case that— there is only one case here that you're being asked to try, and that's the allegation made by the young girl who testified yesterday, and that's it. And if there was any implication at all in any testimony yesterday about some other case or some other incident, that's simply not relevant to this proceeding, and you're only here to try this one allegation.

Either it does focus on the fact that this is it; or it highlights it, worse; or three, they say, I don't even know

what you're talking about, because they didn't pick it up.

Defense counsel: What's your—what would the Court, sua sponte, if counsel never brought it up—

The Court: If counsel doesn't ask, my inclination would be not to highlight it and leave it as it is, because I think at the moment, it is a fair inference that she was aware of her—her sister was aware of the incident involving this young complaining witness who testified yesterday, and she was concerned about her child too, based upon the information that she had. That's a fair inference from the question and what happened. . . .

Defense counsel: Right, but that's—my concern is just that one short phrase was enough that a jury in a case like this, where there's—I think all of us would agree it is extremely close.

The Court: I don't—I'm not saying that if the Supreme Court decided that that was too close, that I could say, Gee, I'm upset that I made the wrong call. I think it is concerning, but in thinking about it overnight and thinking about the context in which it was said and the question that was asked, I don't perceive it as being as significant as if you just simply read the answer in the cold.

And I'm not inclined to try to give a curative instruction unless counsel— because I think that's a litigation decision that needs to be made as to whether or not you want it or not. If you want it, I'll give it. If you don't want it, I will leave it alone. Because if I do it independently, I'm perhaps affecting your litigation strategy.

Defense counsel ultimately did not request a curative instruction.

After the State presented its case, defense counsel moved for a judgment of acquittal on the ground that "the testimony of the alleged victim in court was extremely unclear." The trial judge denied that motion and relevantly explained:

[S.C.], who is nine today, in the courtroom, for a nine-year-old, did remarkably well in testifying concerning the events. And that, together with the investigative tape that was done by the CAC, is certainly sufficient to establish the charge.

Defense counsel then presented his case, attempting to establish that S.C.'s mother and aunt (now Gomez's ex-wife) had fabricated the allegation of rape. Defense counsel called several witnesses, including S.C.'s mother. Before defense counsel began his direct examination of S.C.'s mother, the following exchange occurred:

Defense counsel: Your Honor, the defense calls [S.C.'s mother].

The Court: You can have a seat since you've been sworn previously.

Interpreter: Thank you, Your Honor.

The Court: Thank you for coming back from Sussex.

Although the trial judge stated, "you've been sworn previously," it is unclear from the record whether the trial judge directed that statement towards the interpreter or S.C.'s mother, who had testified the previous day.

### Guilty Verdicts and Post–Trial Rulings

The jury ultimately found Gomez guilty of two counts of rape first degree. Gomez moved for a new trial on two grounds: (1) he was prejudiced when S.C. entered the courtroom and testified while holding a teddy bear, and (2) he was prejudiced when S.C.'s mother referred to Gomez's

commission of a similar sexual offense during her testimony. But the trial judge denied that motion. In a Letter Opinion,[3] the trial judge addressed the first ground as follows:

Counsel asserts he did not object at the time since he did not want to be viewed in a bad light as the one who forced the young child to give up her security animal. The fallacy in Defendant's argument is that there was clearly an opportunity for counsel to object and raise the issue with the Court before her testimony began. The Court questioned the young victim outside the presence of the jury prior to her testimony to ensure she appreciated the difference between right and wrong and the importance of telling the truth in the courtroom. If counsel had a concern, he should have raised it with the Court at that time. There was no objection made, and the Court finds that there was no prejudice by this conduct. This young girl was obviously traumatized by the conduct of the Defendant, but in spite of the difficulty of coming into a courtroom full of strangers to relay what had occurred, the testimony of this 9 year old was compelling and convincing. It was the impact of what she said during her testimony, and not the teddy bear, that convicted the Defendant.[4]

The trial judge then addressed the second ground as follows:

The specifics of the Defendant's prior conviction were not given to the jury nor does the Court believe it is a fair interpretation of the statements in the context in which they were given that the Defendant had been convicted of some other offense. The Court offered to give a curative instruction, but in defer-

---

3. *State v. Gomez,* 2010 WL 2396934 (Del.Super. May 26, 2010).

4. *Id.* at *1.

ence to counsel's desire not to highlight the issue further, it agreed not to give such an instruction. The Court believes this was an appropriate decision by counsel and frankly in light of the significant testimony by the defense of the alleged efforts to put the Defendant and his brother in sexually compromising positions, this isolated statement had no bearing on the outcome of this trial.[5]

Thereafter, the trial judge sentenced Gomez to forty years in prison. This appeal followed.

Gomez raises five arguments on appeal: (1) that the trial judge abused his discretion in denying Gomez's mistrial motion after S.C.'s mother referred to Gomez's commission of a similar sexual offense against S.C.'s cousin, (2) that the trial judge abused his discretion in admitting the video of the CAC interview because the State did not satisfy the foundational requirements of title 11, section 3507 of the Delaware Code, (3) that the trial judge erred in failing to swear the interpreter at the trial, (4) that the State did not present sufficient evidence to support the rape first degree convictions, and (5) that the trial judge abused his discretion in permitting S.C. to hold a teddy bear while she testified. We find merit to Gomez's first argument. Because we conclude that Gomez is entitled to a new trial, we need not decide whether Gomez's remaining arguments have merit. But, we comment on three of those arguments to provide guidance for Gomez's new trial, as well as other cases.

### Mistrial Required

■ Gomez argues that the trial judge committed reversible error in denying his mistrial motion after S.C.'s mother referred to Gomez's commission of a similar sexual offense against Gomez's other niece (S.C.'s cousin). Gomez argues that "the infection of the process with [the] suggestion that [he] had molested still another niece gave rise to a probability that this was a factor of significance in the jury reaching a [guilty] verdict."

■ We review a trial judge's denial of a motion for a mistrial for abuse of discretion.[6] We have explained that a prompt curative instruction that does not overemphasize an improper remark is often an appropriate "meaningful and practical alternative" to a mistrial.[7] It is well established in Delaware that a trial judge's prompt curative instruction is presumed adequate to direct the jury to disregard improper statements and cure any error.[8] But, in cases where there is no meaningful and practical alternative, a mistrial is re-

5. *Id.* at *2.

6. *McNair v. State,* 990 A.2d 398, 403 (Del. 2010) (citing *Purnell v. State,* 979 A.2d 1102, 1108 (Del.2009)).

7. *Banther v. State,* 977 A.2d 870, 890–91 (Del. 2009) (citing *Kurzmann v. State,* 903 A.2d 702, 708–09 (Del.2006)).

8. *McNair,* 990 A.2d at 403; *Purnell,* 979 A.2d at 1108–09; *Smith v. State,* 963 A.2d 719, 722–23 (Del.2008); *Revel v. State,* 956 A.2d 23, 27 (Del.2008); *Justice v. State,* 947 A.2d 1097, 1100 (Del.2008); *Hendricks v. State,* 871 A.2d 1118, 1122–23 (Del.2005); *Fuller v. State,* 860 A.2d 324, 328–29 (Del.2004); *Price v. State,* 858 A.2d 930, 939–40 (Del.2004); *Pena v. State,* 856 A.2d 548, 551–52 (Del. 2004); *Steckel v. State,* 711 A.2d 5, 11–12 (Del.1998); *Taylor v. State,* 690 A.2d 933, 935 (Del.1997); *Ferguson v. State,* 642 A.2d 772, 778 (Del.1994); *Dawson v. State,* 637 A.2d 57, 62 (Del.1994); *Sawyer v. State,* 634 A.2d 377, 380 (Del.1993); *Pennell v. State,* 602 A.2d 48, 52 (Del.1991); *Kornbluth v. State,* 580 A.2d 556, 560 (Del.1990); *Weddington v. State,* 545 A.2d 607, 612 (Del.1988); *Brokenbrough v. State,* 522 A.2d 851, 857 (Del.1987); *Diaz v. State,* 508 A.2d 861 (Del.1986); *Boatson v. State,* 457 A.2d 738, 743 (Del.1983); *Edwards v. State,* 320 A.2d 701, 702–03 (Del.1974).

quired.[9] We have recognized that a trial judge should grant a mistrial only where there is "a manifest necessity or the ends of public justice would be otherwise defeated."[10]

This Court's holding in *Ashley v. State*[11] is instructive. There, the defendant was charged with murder for the stabbing death of a fellow inmate. The defendant testified in his own defense at trial. The defendant admitted that he had previously been convicted of a similar offense—assault in a detention facility. The trial judge excluded the details of that prior conviction—namely, that the defendant had stabbed another inmate with a shank—on the ground that it was prejudicial because the jury would likely infer that if the defendant had committed a similar crime in the past, he likely committed the offense for which he was being tried. Immediately after defense counsel's closing argument in the guilt phase, a courtroom spectator—later identified as the victim of the prior conviction—stood up and yelled to the jurors: "Don't think he's not guilty, he stabbed me in the back 14 times. Don't think he's not guilty. He's nothing but a coward. Stabbed me in the back." Defense counsel moved for a mistrial, but the trial judge denied it and instead issued a curative instruction. The jury convicted the defendant of murder the next day. Defense counsel then renewed his mistrial motion, but the trial judge again denied it and explained that the curative instruction cured any prejudice.[12]

On appeal, the defendant in *Ashley* argued that the trial judge abused his discretion in denying the mistrial motion. This Court agreed, explaining that "the spectator's outburst injected into the trial the assertion of a prior bad act that was patently and squarely on point with the very type of crime for which [the defendant] was on trial."[13] Although the trial judge had excluded the details of the prior conviction for fear of prejudicing the defendant, this Court held that a mistrial was required because "the content of the spectator's outburst was so closely related to the evidence that had been excluded from [the defendant]'s trial that the prejudice from the outburst far exceed[ed] the threshold where a curative instruction [could have] remed[ied] the prejudice suffered."[14]

Here, the trial judge determined that Gomez's prior conviction for a similar sexual offense against Gomez's other niece (S.C.'s cousin) was inadmissible. Yet, S.C.'s mother testified about Gomez's prior sex crime against a similarly situated individual (Gomez's other niece). That testimony "injected into the trial the assertion of a prior bad act that was patently and squarely on point with the very type of crime for which [Gomez] was on trial."[15] When the jury heard that Gomez had committed a similar sexual offense against Gomez's other niece (S.C.'s cousin), which was not the subject of the current proceeding, that testimony created an impermissible inference that he had committed the offense for which he was being tried. In these circumstances, a mistrial was required because "the content of the [witness]'s [testimony] was so closely related

---

9. *Banther,* 977 A.2d at 890.

10. *Id.*

11. 798 A.2d 1019 (Del.2002).

12. *State v. Ashley,* 1999 WL 463708, *4–8 (Del.Super. Mar. 19, 1999).

13. *Ashley,* 798 A.2d at 1022.

14. *Id.* at 1022–23.

15. *See id.* at 1022.

to the evidence that had been excluded from [Gomez]'s trial that the prejudice from the [testimony] far exceed[ed] the threshold where a curative instruction [could have] remed[ied] the prejudice suffered." [16] Because a mistrial was required, we must reverse the convictions and remand this case for a new trial. To provide guidance at that new trial and in other cases, we next comment on additional arguments made by Gomez.

### Foundational Requirements of Title 11, Section 3507

The video of S.C.'s interview at the CAC was a significant part of the State's case. For the video of the CAC interview to be admitted into evidence, the State was required to satisfy the foundational requirements of title 11, section 3507 of the Delaware Code.[17] Gomez argues that the trial judge abused his discretion in admitting the video of the CAC interview, because the State did not satisfy the foundational requirements of section 3507. Gomez also argues that the State should have been required to elicit testimony from S.C. that "addressed the basic elements of the crimes charged." [18]

■ Title 11, section 3507 of the Delaware Code provides:

(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

(c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

During the forty-one years since the General Assembly enacted section 3507, this Court has established certain foundational requirements for the admission of statements under that section. In a trilogy of recent cases, we ratified and reaffirmed our prior holdings.[19] We explained: "A two-part foundation must be established by the State during its direct examination before a witness' prior statement can be admitted under section 3507. First, the witness must testify about the events." [20]

---

16. *See id.*

17. Our precedents have held that an out-of-court statement may be admitted pursuant to section 3507 so long as the declarant voluntarily made the statement, the declarant testifies that the statement was truthful, and the declarant testifies about the events and the out-of-court statement itself. *Blake v. State*, 3 A.3d 1077, 1081 (Del.2010) (citing *Ray v. State*, 587 A.2d 439, 444 (Del.1991)).

18. It appears that the trial judge in this case somewhat shared that view. As recounted above, the trial judge emphasized that concern during the pretrial conference as follows:

The only thing I would ask that you think about is if she is able to testify concerning the events as displayed on the tape, it seems redundant to have the [tape] played again. So I would prefer that we see how that plays out, because if it becomes unnecessary, it just delays the process.

19. *Stevens v. State*, 3 A.3d 1070 (Del.2010); *Blake v. State*, 3 A.3d 1077 (Del.2010); *Woodlin v. State*, 3 A.3d 1084, 1087 (Del.2010).

20. *Blake*, 3 A.3d at 1081 (citing *Ray*, 587 A.2d at 444). *See also Woodlin*, 3 A.3d at 1088 (quoting *Ray*, 587 A.2d at 443).

As to this requirement, we have explained that the direct examination must "touch both on the events perceived and the out-of-court statement itself." [21] Second, "the witness must indicate whether or not the events are true." [22] We again reaffirm those holdings.

\* \* \*

We take this opportunity to underscore the importance of creating an adequate foundation for the admission of statements under section 3507. That requires balancing significant and competing policy considerations. On the one hand, we respect the significant concerns that the General Assembly addressed in enacting section 3507. [23] On the other hand, we also recognize that "[t]he admission of out-of-court statements can have an impact on the practical ebb and flow of the criminal trial drama." [24] Specifically, where the State elicits only minimal testimony to narrowly satisfy the foundational requirements of section 3507, the defendant may be unfairly disadvantaged. In *Keys v. State*, [25] this Court explained that, in order to use an out-of-court statement under section 3507, the statutory language required the production and the direct examination of the declarant by the State. The Court in *Keys* explained its concern thusly:

> The prosecution, instead of bearing the burden of sponsoring as a witness the out-of-court declarant ..., is able to present the out-of-court statement through an officer of the law and an officer of the Court. Additionally, the burden is shifted to the defendant to call the witness and it thus appears to the jury, regardless of technicalities of cross-examination and formal vouching for the witness, that the defendant is sponsoring the witness or refusing to sponsor him. That burden is not fair. If the State carried its position to its logical extreme, the State could rest its case without calling a single eyewitness to any pertinent fact. That is not a trial as we know it. The State should not be able to rest its case without calling the witnesses it relies upon to prove it. This is particularly true when the State relies on witnesses who have obvious vulnerability as to credibility. [26]

■ We recognize the temptation for the State to ask relatively benign questions to comply—but only technically—with the foundational requirements of section 3507. The consequence is that that tactic may force defense counsel to attempt to vigorously cross examine the witness, which in turn may antagonize the jury. [27] That is the concern that this Court recognized in *Keys*. Here, the trial judge correctly required more direct examination inquiry by the prosecutor. We approve

**21.** *Dailey v. State*, 956 A.2d 1191, 1194 (Del. 2008) (quoting *Keys v. State*, 337 A.2d 18, 23 (Del.1975)).

**22.** *Blake*, 3 A.3d at 1081 (citing *Ray*, 587 A.2d at 444). *See also Woodlin*, 3 A.3d at 1088 (quoting *Ray*, 587 A.2d at 443).

**23.** *Ray*, 587 A.2d at 444 ("We recognize the difficulty involved in the presentation of the testimony of small children, particularly in sexual abuse cases."). *See also Getz*, 538 A.2d at 734 ("We recognize that crimes of sexual abuse, particularly those involving children, are sometimes difficult to prosecute because of the ages of the victims and the fact that such offenses usually take place in secret and under conditions of adult-imposed duress.").

**24.** *See Keys*, 337 A.2d at 23.

**25.** 337 A.2d 18 (Del.1975).

**26.** *Id.* at 23–24 (citation omitted).

**27.** *See, e.g., Johnson v. State*, 338 A.2d 124, 127 (Del.1975) ("[T]he defense did not attempt any detailed cross examination of [the witness], presumably for good tactical reasons since she was a victim who evoked considerable sympathy.").

that intervention. On direct examination the State must make a good faith effort to elicit the evidence contained in the witness's section 3507 statement during that witness's direct testimony under oath and in the presence of the jury before a section 3507 statement can be introduced.[28] This practice—consistent with the prosecutor's role as a minister of justice and not simply as an advocate [29]—will produce trials more consistent with the values that underlie Anglo–American criminal proceedings, because the evidence against a defendant will be presented in what is "traditionally considered the most reliable form, that of direct testimony in open court." [30] If the State wishes to play the video of the CAC interview at Gomez's new trial, it must fairly elicit the direct testimony required to satisfy the foundational requirements of section 3507.

### Sworn Interpreter Required

Gomez also argues that the trial judge erred by failing to swear the interpreter at

his trial. In *Diaz v. State*,[31] this Court held that "[b]efore participating in any court proceeding, all interpreters must swear under oath that they will comply with the provisions of the Delaware Court Interpreters' Code of Professional Responsibility." [32] Similarly, Delaware Rule of Evidence 604 provides: "An interpreter is subject to the provisions of these Rules relating to ... the administration of an oath or affirmation to make a true translation." [33] This Court's administrative directive also provides that "[a]n oath shall be administered to court interpreters providing interpretative services in connection with court proceedings at the commencement of each proceeding, *unless the interpreter is a full or part-time court employee.*" [34]

The requirement for an interpreter to be sworn is one of long-standing. As early as 1906, Professor and Judge Victor B. Woolley recognized that an interpreter should

28. *See* Peter Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases,* 91 Harv. L. Rev. 567, 579 (1998) ("Before it may use a witness' out-of-court statements against the accused at trial, the state has an obligation to make a 'good faith effort' to produce the witness in person and, having produced the witness, to try to elicit his evidence in the form of direct testimony under oath and in the presence of the jury.").

29. Del. Lawyers' Rules of Prof'l Conduct R. 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.").

30. *See* Westen, *supra* note 28, at 578. *See also Maryland v. Craig,* 497 U.S. 836, 846, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) ("The combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the

trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings.") (citing *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)).

31. 743 A.2d 1166 (Del.1999).

32. *Id.* at 1182.

33. Delaware Rule of Evidence 604 is consistent with its federal analog. F.R.E. 604 ("An interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation."). *See also* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2417 (3d ed.) ("Interpreters should take an oath or affirmation that they will make a true translation.").

34. Admin. Directive No. 107 ¶ 8 (Del. Apr. 4, 1996) (emphasis added).

be sworn.[35] An interpreter is required to take an oath because "[a] person who is unquestionably fluent in a foreign language may not understand the role of an official interpreter and the ethical issues related to court interpretation."[36] This Court's administrative directive explains that "[c]ourt interpreters act as officers of the court while providing interpretative services and, as a consequence, must abide by ethical considerations to ensure the proper administration of justice."[37] Canon 2 of the Delaware Court Interpreters Code of Professional Responsibility similarly explains that "[c]ourt interpreters fulfill a special duty to interpret accurately and faithfully...." Requiring an interpreter to take an oath informs the interpreter of his critical role.[38]

The record does not clearly reflect whether the trial judge declined to swear the interpreter at Gomez's trial because the trial judge adopted an improper practice—as Gomez contends—of never swearing interpreters, or because the interpreter was a court employee who previously had been sworn pursuant to this Court's administrative directive. One could infer from one of the trial judge's exchanges that the interpreter had been sworn previously, perhaps as a court employee.[39] But, we cannot validate that inference because the record does not reflect, and the parties have not disclosed, the identity of the interpreter.

If an interpreter is necessary, the trial judge is required to swear that interpreter before he or she participates in the proceeding. If the interpreter is a full or part-time court employee who is not *required* to take an oath at the trial,[40] the trial judge should state that on the record so that the record will be complete.

### Substantial Need Required for Implementation of Special Accommodation

Gomez argues that the trial judge committed plain error in permitting S.C. to

---

**35.** *See* VICTOR B. WOOLLEY, PRACTICE IN CIVIL ACTIONS AND PROCEEDINGS IN THE LAW COURTS OF THE STATE OF DELAWARE § 664 (1906). Judge Woolley stated that the following oath should be administered:

> A.B. you shall well and truly interpret unto the Court and Jury the evidence that shall be delivered to them by C.D., a witness ... and you shall also well and truly interpret to the said witness the questions and demands which shall be made by the said Court and Jury of said witness, so help you God.

*Id. See also* Superior Court of Delaware, Courtroom Procedure, Duties of the Prothonotary, 33–35 (1965).

**36.** *Diaz*, 743 A.2d at 1183.

**37.** Admin. Directive No. 107 (Del. Apr. 4, 1996).

**38.** *See Green v. State*, 260 A.2d 706, 708 (Del. 1969) (Herrmann, J., dissenting) ("A person designated and sworn by the Court as the interpreter for the trial becomes part of the Court's 'team' momentarily and is *cloaked*

*with officialdom in the eyes of the jury.")* (emphasis added). *See also* 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2417 (3d ed.) ("The selection of an interpreter should be made with great care because the quality of translation often is of critical importance for both the court and the jury.").

**39.** The following exchange occurred during the second day of trial:

> Defense counsel: Your Honor, the defense calls [S.C.'s mother].
> The Court: You can have a seat since you've been sworn previously.
> Interpreter: Thank you, Your Honor.
> The Court: Thank you for coming back from Sussex.

**40.** *See* Admin. Directive No. 107 ¶ 8 (Del. Apr. 4, 1996) ("Full or part-time court employees providing interpretative services in court proceedings shall take an oath once as an oath of office, which shall bind the employee throughout his or her employment with the Judiciary.").

hold a teddy bear during her testimony. At oral argument, Gomez also argued that the trial judge should not have allowed the jury to see S.C. walk to the witness stand with the teddy bear.

The General Assembly has recognized that child witnesses differ from adult witnesses in important respects. In the "Child Victims and Witnesses" subchapter of title 11, chapter 51 of the Delaware Code, the General Assembly stated its legislative intent as follows:

> The General Assembly finds that it is necessary to provide child victims and witnesses with additional consideration and different treatment than that usually required for adults. It is therefore the intent of the General Assembly to provide each child who is involved in a criminal proceeding within the Superior Court with certain fundamental rights and protections.[41]

In *Czech v. State*,[42] we excerpted that statement of legislative intent and explained:

> In the absence of extraordinary circumstances ..., a trial judge should not make special accommodations *sua sponte*. We hold that such special accommodations should only be made if it has been determined, upon motion, that the requesting party has demonstrated a "substantial need" for their implementation.[43]

Here, the trial judge recognized that permitting S.C. to walk to the witness stand in the presence of the jury might unduly elicit sympathy. It appears that the trial judge addressed that risk and properly provided for S.C. to walk to the witness stand before the jury entered the courtroom. The trial judge also properly allowed S.C.'s mother to serve as a support person after the prosecutor moved, and demonstrated a substantial need, for such relief. It would have been appropriate for the trial judge also to have required the prosecutor to demonstrate a substantial need for the additional special accommodation of the teddy bear. If the State wishes to make special accommodations at Gomez's new trial, the trial judge should permit them only if he determines, upon the State's motion, that the State has demonstrated a substantial need for their implementation.

### Conclusion

The judgments of the Superior Court are **REVERSED** and the matter is **REMANDED** for a new trial consistent with this Opinion.

---

**41.** 11 *Del. C.* § 5131. In the trial judge's post-trial Letter Opinion, he recognized that legislative intent: "The Delaware General Assembly has [ ] stated that 'additional consideration' should be given to child witnesses when involved in Superior Court criminal proceedings." *Gomez*, 2010 WL 2396934, at *1 n. 1 (citing 11 *Del. C.* § 5131).

**42.** 945 A.2d 1088 (Del.2008).

**43.** *Id.* at 1094. In *Czech,* we also listed six factors that a trial judge should consider to guide his discretion in evaluating a motion for a special accommodation. *Id.* at 1096–97 (quoting *State v. T.E.,* 342 N.J.Super. 14, 775 A.2d 686, 697–98 (App.Div.2001)).